UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

VALERIE D. HOLLOWAY                          CIVIL ACTION

VERSUS                                       NUMBER: 05-1637

JO ANNE B. BARNHART,                         SECTION: "F"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION

### REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Disability Insurance Benefits ("DIB").  (Rec. docs. 11, 14).

Valerie D. Holloway, plaintiff herein, filed the subject application for DIB on July 22, 2002, alleging disability as of March 16, 2001.  (Tr. pp. 36-38).  In a Disability Report completed by plaintiff on the former date, she identified high blood pressure, diabetes, and a back injury as the conditions resulting in her inability to work.  (Tr. p. 42).  Those conditions first began bothering plaintiff on February 9, 2000 and ultimately

rendered her unable to work on March 16, 2001.  (Id.).

Plaintiff's application for DIB was denied at the first step of the Commissioner's administrative review process on January 3, 2003. (Tr. pp. 29-33).  Pursuant to her request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on April 12, 2004 at which plaintiff, who was represented by counsel, appeared and testified.  (Tr. pp. 34-35, 172-184).  On May 20, 2004, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. pp. 13-21).  After receiving additional evidence from plaintiff, on March 25, 2005, the Appeals Council ("AC") denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner.  (Tr. pp. 7, 4-6).  It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In her cross-motion for summary judgment, plaintiff essentially argues that the ALJ improperly credited the opinions of a non-treating, non-examining physician over those of her treating physician, Dr. George. Relevant to a resolution of that argument are the following findings made by the ALJ:

1.  [t]he claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act

and is insured for benefits through the date of this decision.

2.   [t]he claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.   [t]he claimant's low back pain associated with degenerative changes in the lumbar spine, diabetes and hypertension are considered "severe" based on the requirements in the Regulations 20 CFR §404.1520(c).

4.   [t]he medical determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.   [t]he undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.   [t]he claimant has the following residual functional capacity:  to lift 10 pounds occasionally.  She can sit for up to 6 hours in an 8 hour day with normal breaks.

7.   [t]he claimant's past relevant work as Bank Teller did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR §404.1565).

8.   [t]he claimant's medically determinable low back pain associated with degenerative changes in the lumbar spine, diabetes and hypertension do not prevent the claimant from performing her past relevant work.

9.   [i]n the alternative, the claimant is "not disabled" under the provisions of Rule 202.21.

10.  [t]he claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR §404.1520(f)).

(Tr. p. 20).

Judicial review of the Commissioner's decision to deny Social Security benefits is limited under 42 U.S.C. §405(g) to two

inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner. Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking Social Security benefits bears the burden of proving that she is disabled within the meaning of the Social Security Act. Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988).

4

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A).  Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled.  Harrell, 862 F.2d at 475.  In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §404.1520, as follows:

1.   an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2.   an individual who does not have a "severe impairment" will not be found to be disabled.

3.   an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4.   if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.

5.   if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987).  In determining whether a claimant is capable of performing the work that she has done in the past, the ALJ is required to assess the demands of the prior work and to compare those demands to the claimant's present capabilities. <u>Villa</u>, 895 F.2d at 1022; <u>Hollis v. Bowen</u>, 837 F.2d 1378, 1386 (5th Cir. 1988); <u>Epps v. Harris</u>, 624 F.2d 1267, 1274 (5th Cir. 1980). If the analysis reaches the fifth step, the ALJ may establish that there is other work available that the claimant can perform by relying on the Medical-Vocational Guidelines of the Regulations when the claimant suffers only from exertional impairments or where her non-exertional impairments do not significantly affect her residual functional capacity. <u>Selders v. Sullivan</u>, 941 F.2d 614, 618 (5th Cir. 1990); <u>Fraga</u>, 810 F.2d at 1304.  Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. <u>Mays v. Bowen</u>, 837 F.2d 1362, 1364 (5th Cir. 1988); <u>Fraga</u>, 810 F.2d at 1302.

At the time of the administrative hearing held on August 12, 2004, plaintiff was forty-eight years of age, had completed four years of college in bookkeeping/accounting, and had past relevant

work experience as an eighteen-wheel truck driver and a bank teller/customer service representative. Plaintiff testified to having been involved in an on-the-job accident on February 9, 2000 in which her seat bottomed out and she hit the frame of the truck. Her condition did not improve after several days of bed rest so she returned to New Orleans and was evaluated by a workers' compensation physician who rendered a diagnosis of a back injury and degenerative disease, never explaining to plaintiff that her back was reportedly pressing against a nerve, resulting in pain radiating down through her legs. After the passage of an unspecified amount of time, plaintiff began feeling better so she resumed her truck driving job for a year before ultimately being unable to continue in March of 2001. For her workplace injury, plaintiff had received a "small" compensation settlement payment.

Plaintiff testified to experiencing pain in her lower back, buttock, hip, pelvis, middle part of the leg, ankle, foot, and toes - her whole left side for all practical purposes. Just sitting up caused the pain to increase. For treatment, plaintiff was being followed by Dr. George, a worker's compensation doctor whom she had selected, who had prescribed Vicodin, Bextra, and a muscle relaxer. On three separate occasions, Dr. George had recommended surgery and had refused to release plaintiff to return to employment until the surgery was performed. According to plaintiff, Dr. George advised her that without the surgery, her condition was only going to

worsen and, due to the passage of time, the surgery would not be as effective as it would have been if performed sooner.  In terms of daily activities, plaintiff testified that she spent much of her time laying down.  She lived alone and obtained assistance from her mother and a male friend in performing the necessary household chores.  Plaintiff was able to drive and she got out of the house and did so occasionally.  She would also grocery shop but rarely did so alone and even then, she could only pick up light objects and had to avoid bending.  (Tr. pp. 172-184).

The medical records admitted in the administrative proceedings below begin with a report dated March 17, 200 from Dr. Robert Steiner, an orthopaedist.  The note begins by recalling plaintiff's on-the-job injury of February 9, 2000 and her resulting treatment with Dr. Hawley in the form of medication and physical therapy. Plaintiff was working in the office on light duty status at the time.  She complained of activity-related low back pain, right buttock pain and throbbing pain in the right leg, and tingling in the right leg.  She was more comfortable in a prone position than a supine position.

On physical examination, plaintiff stood without scoliosis or a list and she ambulated with a normal gait.  Active range of motion of the lumbar spine was limited to sixty degrees of flexion, ten degrees of extension, and lateral bending was twenty degrees in each direction.  Plaintiff reported tenderness upon palpation of

the right buttock but no lumbar spasm.  Lower extremity motor and sensory exams revealed no deficits and deep tendon reflexes at the knees and ankles were absent but symmetrical.  Sitting straight leg raising signs were negative as was the case on the left in a supine position but posterior thigh pain was noted on the right.  X-rays of the lumbar spine revealed moderate narrowing at L5-S1 with anterior spur formation and similar studies of the pelvis were within normal limits.  In Dr. Steiner's opinion, plaintiff had complaints and findings suggestive of right sciatica.  She was advised to continue with her prescribed exercises and medication and an MRI was recommended to rule out disc herniation.  In the meantime, plaintiff was capable of continuing to work in an office setting.  (Tr. pp. 86-87).

Plaintiff underwent the recommended MRI on March 29, 2000 which revealed degenerative-hypertrophic findings within the lumbar spine, particularly at L4-5 and L5-S1, with the findings being greatest at L5-S1 where there was also some concentric Type IIa protrusion of disc material.  There was also multifactor neural foraminal narrowing at L4-5 and L5-S1, greatest at L5-S1.  (Tr. pp. 88-89).  X-rays of the lumbar spine taken on that day were essentially unremarkable.  (Tr. p. 90).

On April 5, 2000, plaintiff returned to Dr. Steiner to obtain the results of her recent testing.  She was still complaining of back pain at that time and physical examination results remained

unchanged.  The results of the MRI notwithstanding, plaintiff was clinically "much improved" and expressed a desire to return to her regular work duties.  Plaintiff was cleared to do so as of April 6, 2000.  (Tr. p. 85).  When plaintiff returned to Dr. Steiner for follow-up on May 1, 2000, her back pain had resolved, she had no leg symptoms, and she had resumed her regular work duties without difficulty.  Plaintiff was to see Dr. Steiner from that day forward only on an as-needed basis.  (Tr. p. 84).

On November 28, 2000, plaintiff was seen for routine medical monitoring by Dr. Harold Shelby.  She was doing well at the time and had no complaints.  Various testing was to be scheduled.  (Tr. p. 96).  These studies were performed in the following month.  (Tr. pp. 103-107).  Plaintiff returned to Dr. Shelby to obtain the test results on January 5, 2001 and she was said to be doing well at that time.  Lipitor was prescribed.  (Tr. p. 95).  Bilateral x-rays of the tibia and fibula taken on March 19, 2001 revealed deformity and radiolucency on the metaphyseal region of the right tibia thought to be due probably to old trauma.  Similar studies of the feet showed hallux valgus deformity and degenerative changes of the first metatarsophalangeal joints and some small spurs.  X-rays of the lumbar spine revealed moderate degenerative changes at L5-S1 and mild to moderate facet osteoarthropathy at L4-L5 and L5-S1.  (Tr. pp. 93-94, 151-152).

Plaintiff returned to Dr. Shelby for follow-up care on March

26, 2001.  On this occasion, plaintiff's diabetes was characterized as uncontrolled.  Her medications were adjusted and additional testing was scheduled.  (Tr. p. 92).  On March 28, 2001, plaintiff was seen by Dr. Debra Burris for complaints of left leg pain from the hip down to the foot.  Plaintiff had muscle cramps in the left leg but no weakness or numbness and no lower back pain.  The impression was left sciatica and osteoarthritis.  Vioxx and Neurontin were prescribed.  (Tr. pp. 114-115).  Plaintiff continued to complain of left leg pain when she returned to Dr. Burris on April 4, 2001.  The prescribed Vioxx and Neurontin provided her only slight relief and cramps were now present in both legs.  The impression was left L5 radiculopathy, left knee pain, and osteoarthritis.  Additional medications were dispensed.  (Tr. p. 113).  When seen by Dr. Shelby on April 9, 2001, plaintiff complained of right leg and left knee pain but her knee pain had improved.  (Tr. p. 91).  An MRI performed on April 12, 2001, at the suggestion of Dr. Burris revealed the following:  1) degeneration and diffuse bulging at the L5-S1 disc which caused a mild anterior extradural defect as well as circumferential bulging at L5-S1 with resulting bilateral neural formamina encroachment, more severe on the left; 2) slight bulging of the L4-L5 disc which caused a mild anterior extradural defect; and, 3) degeneration and slight protrusion of the T10-T11 disc which caused a mild anterior extradural defect.  (Tr. pp. 112, 150).

On April 24, 2001, plaintiff was seen by Dr. Kenneth Veca of the Knee Center and Orthopaedic Clinic.  In relating her pertinent medical history, plaintiff advised Dr. Veca that she had suffered an on-the-job injury in February of 2000 which resolved itself in three months, following which she had returned to work as a truck driver.  Plaintiff experienced no further problems until March of 2001 when the symptoms returned to her left side and she was unable to continue in her job.  On physical examination, plaintiff had positive straight leg raising on the left at seventy degrees but no tenderness or spasm.  The diagnosis was degenerative disc disease at L5-S1 and left lumbar radiculopathy affecting the L5 nerve root.  Consultation with plaintiff's other doctor was recommended. (Tr. p. 109).

Plaintiff returned to Dr. Burris on May 2, 2001, and reported feeling much better except for some residual soreness on the left.  A physical examination was unremarkable and straight leg raising was negative.  Dr. Burris did, however, recommended that plaintiff stop driving a truck and get a more sedentary job.  (Tr. p. 111).

On May 7, 2001, plaintiff was seen at the IMG Healthcare Group for routine gynecological care.  She had no complaints at the time and the results of the examination were all within normal limits. (Tr. pp. 123-124).  Plaintiff reported feeling much better when she was next seen by Dr. Shelby on May 15, 2001.   The diagnosis

12

included lumbar radiculopathy and controlled hypertension and plaintiff was referred to physical therapy. (Tr. p. 122). Plaintiff had not begun physical therapy by July 16, 2001 so she was referred to Dr. Bryant George for "evaluation of back pain". (Tr. p. 121). Physical therapy had been commenced by August 7, 2001 which provided plaintiff good improvement with her back pain. Her hypertension and diabetes were under control at this time. (Tr. p. 120). The diagnosis on August 23, 2001 was lumbar radiculopathy and plaintiff was referred to Dr. George for back surgery. (Tr. p. 119). An appointment with Dr. Shelby scheduled for October 16, 2001 was apparently not kept. (Tr. p. 118). Another appointment scheduled for December 17, 2001 was cancelled following plaintiff's advice that her insurance coverage had lapsed and that she lacked the funds to pay the doctor. (Tr. p. 117). Plaintiff presented herself to the Medical Center of Louisiana at New Orleans' ("MCLNO") Emergency Room on January 31, 2002 with complaints of a headache for one week. She was referred to various MCLNO clinics for further evaluation. (Tr. pp. 125-128).

The next medical records were not generated until March 5, 2002 when plaintiff submitted to diagnostic testing at the direction of Dr. George, a neurological surgeon. Following radiological studies and a lumbar myelogram, the impression was evidence of a minimal, mild bulge of the annulus fibrosis prominence at L4-L5 and L5-S1 to be correlated with the results of

a CT examination.  (Tr. pp. 153-154).  After the latter test was performed, without contrast, the examiner's impression was: 1) degenerative disc and hypertrophic spondylosis changes of the lumbosacral spine; 2) a three millimeter posterior bulge with annulus fibrosis prominence at L4-L5; and, 3) at L5-S1, a three to four millimeter posterior bulge annulus fibrosis prominence with only minimal to mild compression of the spinal sac though with asymmetrical compression of the left neural foramen with adjacent and schmorl node indentation.  (Tr. pp. 155-156).

On April 29, 2002, plaintiff was counseled at MCLNO regarding her desire to have a tubaligation.  Plaintiff's diabetes and hypertension were also monitored at that time and it was discovered that she had bad bunions.  Her medications were adjusted, testing was scheduled, and referrals were made to the Gynecology and Foot Clinics.  (Tr. p. 136).  When plaintiff returned to MCLNO for follow-up care on June 10, 2002, she reported difficulty in affording her diabetes and hypertension medications.  Plaintiff's medications were adjusted further and she was rescheduled for a pap smear, diabetic eye screening, and to attend tobacco cessation classes.  (Tr. p. 135).

At the request of her workers' compensation insurance carrier, on December 10, 2002, plaintiff underwent a neurological consultation at the hands of Dr. Roger Smith.  In advising the doctor of her medical history, plaintiff recalled her initial on-

14

the-job injury on February 9, 2000, her return to work three months later, and her second, similar work place injury on March 15, 2001. According to plaintiff, she had been seen by Dr. George on August 22, 2201 who recommended an anterior lumbar fusion at L5-S1. Plaintiff also supposedly received a second neurosurgical opinion from Dr. Applebaum on December 14, 2001 who recommended the lumbar myelography that was ultimately performed on March 5, 2002. Following testing, Dr. George had then suggested that plaintiff undergo a left L4-5 microdiskectomy. More recently, plaintiff had reportedly been seen a second time by Dr. Applebaum who felt that plaintiff would not benefit from spinal surgery.

At the time of Dr. Smith's evaluation, plaintiff was being treated with Vicodin and Bextra. She complained of the greatest pain across the low back, more in the sacral and upper buttocks area, which radiated to the groin when standing. It was difficult for her to sit for any length of time. A throbbing pain radiated diffusely down her left leg and she suffered a stabbing pain when attempting any activity. Plaintiff also noted some numbness on the instep of the left foot and some mild cervical pain radiating into the left arm. On physical examination, plaintiff had some mild tenderness over the sacral area as well as just below the pelvic crest, over the buttock, on the left side. Range of motion was very restricted in flexion but extension was better. There was no palpable muscle spasm, straight leg raising was negative

bilaterally, and plaintiff had good strength with no evidence of atrophy.  Based on the results of his exam and, with the exception of the MRI findings, his review of the diagnostic test results, Dr. Smith rendered an impression of chronic lumbar strain, degenerative disc disease at L4-5 and L5-S1, and possible mild left L5 radiculopathy.  The doctor saw no clear indication for surgery and suggested that a nerve root block, back brace, TENS unit, and/or rehabilitation may improve plaintiff's functioning.  (Tr. pp. 143-145).

On December 30, 2002, an Administration employee[1]/ completed a "Residual Functional Capacity Assessment" form based on her review of the CT scan report of March 5, 2002, the treatment note of plaintiff's visit to MCCNO on June 10, 2002, and Dr. Smith's narrative of December 10, 2002.  There, the employee concluded that plaintiff retained the residual functional capacity ("RFC") to lift twenty pounds occasionally, ten pounds frequently; to sit, stand, and/or walk for six hours per eight hour workday with an option to alternate sitting and standing every three to four hours; to push/pull on an unlimited basis; and, to frequently climb and balance but only occasionally perform other postural maneuvers.

---

[1]/ Although the form was intended to be completed by a "medical consultant", which, in the Court's experience, is typically a medical doctor, the block on the form bearing the signature of the employee has the title "medical consultant" scratched through it with the notation "SSA-II" written in just to the right of the employee's signature.  (Tr. p. 77).  The credentials of the reviewing employee are thus unknown.

(Tr. pp. 70-77).   Based on the results of the RFC, the Administration employee found that plaintiff was able to perform her past relevant work as a bank customer service representative as she herself had described it and that she was, therefore, not disabled.  (Tr. p. 78).

The next medical report was not generated until plaintiff returned to Dr. Smith on December 15, 2003.   No change to plaintiff's discomfort was noted and she continued to complain of pain across the lumbrosacral region, down the left leg, and around and into the groin bilaterally.   Plaintiff reported that she was able to do very little housework, had difficulty with bending and standing, and was unable to lift anything.   She had received no new treatment and was simply continued on with pain medications and muscle relaxers.   The results of a brief physical examination were essentially the same as they were a year earlier.   Given the lack of significant pain relief, Dr. Smith opined that plaintiff had reached "maximum medical improvement".   He recommended a functional capacity evaluation ("FCE") to objectively measure the level of plaintiff's disability.   (Tr. pp. 157-158).

On January 14, 2004, Dr. George executed an unaddressed "To Whom It May Concern" letter in which he reported that plaintiff was under his care and that "[h]e/she is permanently disabled and has been instructed to remain off from work until an undetermined date".  (Tr. p. 145).  Plaintiff was seen by Dr. George on February

17

26, 2004 who relayed his findings to plaintiff's former employer's compensation carrier. Although no record of it appears in the administrative file below, plaintiff had apparently been seen by Dr. George on August 20, 2003. Treatment included Vicodin ES, Soma, and Bextra. On physical examination, the lumbar muscle insertions were tender to palpation and objective muscle spasms were present. Range of motion of the lumbar spine was restricted and straight leg raising tests were productive of leg pain at thirty-five degrees on the left but with normal strength, muscle tones, and deep tendon reflexes. Dr. George concluded the note with an opinion that plaintiff was "...totally temporarily disabled. Anticipated date of MMI, the patient is at MMI in twelve to eighteen months following recurrent L4-5 MLD. If such surgery is not authorized, the patient will not be released to work in any form or fashion". Plaintiff was given refills on her Vicodin ES, Soma, and Bextra and was instructed to return to the doctor in three months. (Tr. pp. 169-170, 146-149).

The final piece of documentary evidence admitted into the administrative proceedings below is the report of an MRI performed on April 20, 2004 at MCLNO. The radiologist's impression was multilevel degenerative changes with bilateral neural foraminal narrowing at L5-S1 with thickening of the dorsal root ganglion of the left L5 nerve root likely from edema. (Tr. p. 171).

As noted earlier, plaintiff challenges the Commissioner's

decision to deny DIB on one ground, namely, that the ALJ erred in not accepting the opinions of one of her treating physicians, Dr. George, to the effect that she was unable to work, opting instead to credit the opinions of the Administration reviewer, a non-treating, non-examining individual who may not even be a physician, to the effect that plaintiff was capable of light-level work.  For the reasons that follow, the Court finds merit in that assertion and will recommend that plaintiff's case be remanded to the Commissioner for further development of the record.

In addressing plaintiff's claim, the Court will first point out what the administrative record below does not contain that hampers a meaningful and thorough review.  Unlike the typical Social Security case, the record does not contain a Disability Supplemental Interview Outline completed by the plaintiff that contains a self-report of her ability to engage in the routine activities of daily living, including caring for her own personal needs, preparing meals, performing household maintenance, shopping, driving, socializing, attending church, etc.  And in the usual Social Security case, the claimant is typically asked to submit to a consultative evaluation by a physician of the Commissioner's choosing who will then render a report that provides further insight, presumably from a more objective perspective, of the plaintiff's ability to engage in work-related activities.  It is those two sources of information that are customarily measured

against the findings of the claimant's own treating physicians.

What the record in the case does contain are the reports of at least seven different physicians, all of whom had personally treated plaintiff.  Most notable among those are the opinions of Dr. George, that plaintiff was not capable of work, in any "form or fashion," until she underwent surgery; the opinions of Dr. Burris, recommending that plaintiff obtain a sedentary-level job; and, the findings of Dr. Smith in which he deferred to the results of an FCE which was never performed.  A review of the ALJ's decision reveals that Dr. Burris and Smith were never even mentioned by name.  As for Dr. George, the ALJ reasoned as follows:

> [t]he claimant as (sic) seen neurosurgeon twice, who says she is permanently disabled and off work (Exhibit 10F). However, he has seen the claimant only intermittently, and his restrictions apparently applied only to her past work as a truck driver (Exhibit 10F/3).
>
> The claimant was apparently receiving worker's compensation for part of the period under review. However, this is (sic) not establish that she is unable to perform all substantial gainful activity.
>
> Accordingly, the undersigned finds the claimant retains the following residual functional capacity: to lift 10 pounds frequently and 20 pounds occasionally.  She can stand or walk for up to 6 hours in an 8 hour day with normal breaks.  The state agency doctor, afer reviewing the medical record, concluded that the claimant retained capacity to perform the requirements of light work on a sustained basis (Exhibit 4E).  They recommended that she alternate between sitting and standing.
>
> Based upon the claimant's residual functional capacity, the Administrative Law Judge must determine whether the claimant can perform any of her past relevant work.  The phrase "past relevant work" is defined in the Regulations at 20 CFR §404.1565.  The work usually must have been

performed within the last 15 years or 15 years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the claimant to do the job and meet the definition of substantial gainful activity.

The evidence in this case establishes that the claimant has past relevant work as a truck driver and bank teller.

Based upon the residual functional capacity, the claimant could return to her past relevant work as Bank Teller. The evidence establishes that the claimant could return to this occupation as generally performed in the national economy.

The dictionary of occupational titles documents that this is light work which would allow for alternate sitting and standing.  The claimant has failed to establish that her impairments, even in combination, prevent her from performing the mental and physical requirements of her past relevant work.

In the alternative, and even if the claimant were unable to perform the requirements of her past relevant work, the claimant is "not disabled" under the provisions of the Rule 202.21.

(Tr. p. 19).

AS noted earlier, in his report of February 26, 2004, Dr. George refused to release plaintiff to work, "...in any form or fashion...", until surgery was performed.  The doctor's restrictions thus did not apply solely to plaintiff's past relevant work as a truck driver.  More importantly, however, the RFC assessed by the ALJ is exactly the same as that arrived at by the Administration reviewer, a non-treating, non-examining individual who may not have even been a physician at all and who gave her opinion after reviewing only three pieces of documentary evidence, the CT scan results of March 5, 2002, the MCLNO note of June 10,

21

2002, and Dr. Smith's report of December 10, 2002.  The reviewer was not provided, and thus did not consider, the opinions of Drs. George or Burris or the recommendations of Dr. Smith that plaintiff submit to an FCE.  While the ALJ is bound to consider the opinions of such Administration reviewer, 20 C.F.R. §404.1527(f)(2)(i), he may not reject the findings of a treating physician like Dr. George without conducting a detailed analysis of that physician's views under the criteria set forth in 20 C.F.R. §416.1527(d)(2).  <u>Newton v. Apfel</u>, 209 F.3d 448, 453 (5th Cir. 2000).  Although the ALJ in the present case touched upon several of those factors, he did not discuss the others.  <u>Id</u>. at 457.  For these reasons, it will be recommended that plaintiff's case be remanded to the Commissioner for further development of the record.

<u>**RECOMMENDATION**</u>

For the foregoing reasons, it is recommended that plaintiff's case be remanded to the Commissioner for further development of the record consistent with the Court's opinion.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such

consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en banc</u>).

New Orleans, Louisiana, this <u>27th</u> day of <u>July</u>, 2006.

UNITED STATES MAGISTRATE JUDGE

23